Good morning, Your Honors. May it please the Court, Amber Wexler for the Appellant Warden. EDPA provides that federal habeas relief is available only if a state court decision is contrary to or an unreasonable determination of clearly established Supreme Court law. In this case, the district court did not rely on Supreme Court law to overturn the state court decisions in grant habeas relief. Instead, the district court offered its own interpretation of the facts in the record. It reweighed the evidence and essentially made its own determination as to whether Petitioner Nikoosersht was suitable for parole release. Well, EDPA does have a provision that deals with unreasonable findings of fact, does it not? It does. And here the state courts did not make a determination of fact. The state courts made a determination that the facts presented were some evidence to support the Board's decision. However, even if we were to look at the evidence in this particular case, under EDPA, the issue is whether the decision itself was reasonable. Well, there have been some developments since this was decided. Certainly. And so what that, you know, obviously the committing offense was, you know, there were a number of factors that, you know, certainly from my perspective that make it seem fairly serious that I note in the record it says in the autopsy that the victim was strangled and drowned, which would be consistent. And then also that there was a postmortem, the slashing of the wrist was postmortem. So there are certainly indications that while what happened, I mean, obviously the deceased isn't here to tell us, so we only know what Mr. Nikoosersht has to say about this. So he doesn't have a record before, right? Correct. Okay. So we need to find what's the sum evidence other than the terrible crime. In addition with the commitment offense, both the State Court and the Board pointed out that Mr. Nikoosersht offered varying statements regarding and inconsistent statements regarding the argument on what the variations were. Certainly. Mr. Nikoosersht told his evaluating psychologists that this was an attempted murder-suicide pact, that he did this because he loved the victim, because he wanted them to be together, and that their families would not permit them to be together. This was the interpretation that the district court embraced. However, at the Board hearing, Mr. Nikoosersht said actually his depression and his anger had nothing to do with the victim. He was upset with his family. He was upset. He did not. As I read the record, he is not the one who ever thought this was sort of the romantic-suicide pact. I think that was an overlay that the psychologist assumed from what he said, but I don't see that his explanation, his own personal explanation, ever connected up those two things. His explanation to the psychologist did, which was why the psychologist. Well, we don't know that. We have the report. That's correct. The psychologist interpreted what he told them, and obviously we don't have a transcript of what he told the psychologist, but the psychologist, listening to Mr. Nikoosersht's story, wrote and interpreted it as being he loved the victim. He killed her out of love, whereas. If the State is relying on the psychiatrists and psychologists, which obviously you are, then why aren't you relying on the part in which they say that this person is completely ready for parole and has no greater risk than anybody else in society? The board was concerned because if, as it appears, Mr. Nikoosersht explained this murder as something he did out of love because he couldn't marry the victim, because they couldn't be together, and then at the parole hearing said, actually, no, I murdered the victim because, or my depression that led me to murder the victim was because I was angry with my family. It had nothing to do with her. I had no plans to marry her. I had no plans to be with her. Well, that doesn't really address what I'm asking you. You're picking and choosing when to rely on this psychological report. You say, well, we like this part where it says there's a romantic suicide pact, but we don't like this part where they conclude that he's not a danger to anybody anymore. The board explained that the psychologist was relying on evidence that, as Mr. Nikoosersht showed at the hearing, wasn't true, that he told us that the psychologist's conclusion was based on a description of the crime that was not accurate, that the psychologist determined that he had appropriate insight, that he wouldn't be a danger under the belief that he committed this crime for a certain reason. He later admits, no, that wasn't the reason I committed the crime. I committed it because of my own personal problems. It had nothing to do with her. In that respect, the board found that the psychologist's decision was therefore flawed because the psychologist did not base that finding on an accurate depiction of the facts, on what his mental state actually was. I think we have a constellation of cases, as Judge Callahan mentioned, that may or may not stay static, depending on whether the court chooses to grant any of the pending petitions for rehearing. But we have Hayward, we have Pearson, Kirtle, and Cook, a whole series of cases that are probably not helpful to your arguments. The district court did not have the benefit of those. Assuming, for the sake of this question, that those cases remain as they are now, what should we do? Should we apply them to this situation, or should we remand the matter to the district court to apply all of our new cases? Remand to the district court is certainly an option, but this court under AEDPA is not bound by circuit court decisions. Under AEDPA, this court is bound only by clearly established Supreme Court law. Right, but the cases that I just mentioned interpret the AEDPA standard in this situation as requiring certain things to happen in the California parole situation. And we are bound by our own precedents, whether they're right or wrong. The Pearson and Kirtle and Cook decisions did not rely on clearly established Federal law in finding that it interpreted AEDPA in a way that permits the Federal courts to overturn State court decisions based on State court law. All that tells me is that you think those decisions are wrong. They exist. If they are not taken in bank or reversed by the Supreme Court, our panel is bound by them. That's the way it is. Under AEDPA, however, the Supreme Court has repeatedly stated that circuit law is not availing. We're having trouble communicating. I apologize. A three-judge panel like this one is always bound by prior three-judge Ninth Circuit decisions that are precedential in nature, whether we think they are right or wrong. And so what you've said is those decisions are wrong. And I appreciate they may be, but whoever has that ringing noise has to make it stop. It does not help our analysis just to tell us that those decisions are wrong. Oh, I'm sorry. I apologize then. I misunderstood the question. The Hayward, as an en banc decision, the Hayward decision would bind any subsequent panel decisions, and the Hayward. Circuit three-judge panel decisions. But if, but in this case, we have Pirtle, Pearson and Cook are not consistent with what was set forth in Hayward. In Hayward, this. It doesn't matter. They are what they are. They are, maybe they're wrong. Let's assume that they are wrong. We are bound by them. How do they apply to this case? In this case, then, if we're looking at whether or not the district court's decision was reasonable, I apologize, whether or not the state, the district court correctly found that the state court decisions were unreasonable. Certainly, reasonable minds could differ as to whether, as to the ultimate question of whether Mr. Nekusaresh is suitable for parole release. However, there's no question that the state court's decision was reasonable. The state court's decision was based on not only the heinous nature of the commitment offense, but also on these, on Mr. Nekusaresh's inconsistent statements regarding his motivation for the crime. Well, let's assume, let's assume that the other way, that if Judge Graber's, let's assume that the panel agreed that Judge Graber's right, and if those cases stay put, you're doomed. What about if the cases don't stay put? You know, what do you need to have, you know, what would be your, if Pearson went en banc, say, for example, then it could revisit these other cases. So where would that put you? I'm out of time. Is it all right if I go on to continue the question? I apologize. If those cases are overturned or are not final or are not followed, there's only one Supreme Court decision that deals with parole, with due process in the parole context, and that decision is Greenholtz. And Greenholtz provides that the only process due in the parole context is an opportunity to be heard and a statement of decisions for the parole denial. Now, in this case, there's no question that Mr. Nekusaresh received those protections, so thus, under clearly established Federal law, he received all process due and would not be entitled to Federal abuse relief under ECLA. So your argument strengthens if those cases were overruled? Yes, it would. And since I'm out of time, thank you very much, and I'll submit. Thank you very much, counsel. We'll hear from the appellee. Good morning, Your Honors. May it please the Court. Steve DeFilippis appearing on behalf of the petitioner and appellee in this matter. I'll address the Court's last question. If those decisions are, do go in bonk, it would only be potentially Pearson and Pirtle. Cook has not had a petition for review, as I understand, or a petition for review. Well, but we can revisit our precedent. When we go on bonk, we can wipe everything out if we want. We can start anew to get to a result that we think is right, if we think we were wrong before. Certainly. And I think that if they do go in bonk, one of two things is going to happen. Either the Court's going to come down with the same decision that it spent four years on in Hayward, or it's going to actually strengthen it by looking at the fact that there is Greenholts and Board of Pardons v. Allen as Supreme Court precedent. There's Superintendent v. Hill, which were the original, if you go back to McWillian, Biggs, Irons, Sass, that looked at the due process right as stemming from the clearly established Supreme Court decisions in Greenholts and Board of Pardons v. Allen and in Superintendent v. Hill. So there is strength for the position that's being proffered by the appellee in this matter. The sort of judicial economy question that we face as a three-judge panel, we have, it seems to me, at least two options. Again, just speaking for myself, we can go ahead and decide your case based on what exists now, or we can defer submission until the conclusion of the process in these related cases, and they might or might not end up supporting your view. Again, it doesn't matter whether we think they're right or wrong. They exist right now. What is your advice? You certainly do have that option, but you have a young man that's sitting in prison that's been found suitable for parole by the district court's decision, clearly that there was no evidence to find him unsuitable. He's sitting there in prison. He's been programming exceptionally well. He's doing everything he can possibly do to earn parole, and if you put it off, what's going to happen is if the decisions don't go en banc, well, that will be a quick or relatively quick point that you can get to. But if they do go en banc, they could go en banc and be in there for the length of time that they want. Well, realistically, how different is it going to be if we issue a decision relying on those cases and the State puts in a PFR saying, wait, all these other cases are pending. Make this one penned also. Well, the problem is that we have clear law that's established that you do do the sum evidence analysis. Well, let me ask you on the sum evidence, because this is the ‑‑ being the devil's advocate, why wouldn't it be sum evidence in the sense that he doesn't have a record before, so we're not going to look before for sum evidence of his future dangerousness. So that's good for Mr. ‑‑ how do we say his name, Mr. ‑‑ Nakusharest. Nakusharest. So that's good for him, and that's not going to change. But why isn't there sum evidence when you put together, when you look at the autopsy report, it looks like one plausible explanation for this crime is that he decided to kill her, and after he killed her, then after ‑‑ because the autopsy seems to indicate that she was strangled and drowned, which, you know, I know that that means if drowning would be a cause, there's ways to check the lungs to see that it wasn't just the strangulation, and that the slashing of her wrist was postmortem. We also know that then his explanation was he slashed her wrist to see how he could do it himself. But why isn't a reasonable way to look at that crime that he thought, oh, holy cow, I killed her, now I need to make it look like a murder‑suicide or something along those lines. And, of course, he doesn't complete the act on his own part. And there does seem to be, I think, the psychological evaluations state that we cannot predict violent potential within an intimate relationship, because this seems to be clearly, you know, maybe she told him, I don't want to be with you anymore, and he killed her. Or, you know, it's a male, it's a heterosexual relationship. Obviously, he's been in prison. There's no basis to evaluate whether he's safe in those types of situations. So why aren't these evaluations considered alongside, when you consider alongside the sort of discrepancies in the commitment offense and his explanations of it, why wouldn't that be some evidence of his current dangerousness? There's a number of factors that need to be addressed there. First of all, you start off with a murder in every one of these cases. They're heinous crimes. So the fact that it... Well, they're really not all the same for people that have seen a lot of murders. I mean, yes, it's bad to the... But it's not the same when people are drinking, they get in a fight in a bar, someone goes out, gets a gun, and they... You know, I mean, they're not all the same. There's rape murders, there's torture murders. They're not all... I accept the fact that to the victim, it's all bad. But to the heinousness aspect, they are committed in different ways. And that's true. And that's why the California Supreme Court, which is where you go back to for how the sum evidence analysis is supposed to occur, has said the heinous nature of the offense by itself is not going to necessarily carry the day in one of these cases. It's not going to necessarily equate to parole and suitability when you have somebody who commits that crime, has no past, and turns around their life. Okay, but he was pretty... How are we ever... Let's say, like, a child molester. There's no kids in prison. And so he doesn't molest any of the other very large prisoners. His molestation is of 8-year-olds, and there isn't the opportunity to reoffend. How do we assess that dangerousness? We have, you know... Psychologists. You have psychologists. And a psychologist said, I don't know what he'd be like around a heterosexual. Actually, that's not quite correct. Look at the 2004 psychological report. There, the psychologist says that this is an individual who poses no more danger to society than the average citizen, who says that there are no psychosexual issues that remain, and says that there is nothing that creates a risk issue on heterosexual relationships. Now, you can always say, in just about every case, you can find something that says, gee, we haven't had him in this precise type of circumstance. Now, certainly, if an individual has killed a female as a victim, a male kills a female and goes to prison, there will never, ever be the opportunity to see how they interact in free society with females. You're going to have the same thing. You've never seen how this individual reacts in free society. So, we have to make predictions based upon the factors that we have. And the things that we do have, we have strong psychological reports in this case that very clearly say that Mr. Nekusheresht is not a danger to society if he's released on parole. Now, if he's released on parole at this point, he's got an even better shot, because we've now gone, what is it, a good six years since the time of the hearing that's at question in this case. How old is he now? I believe he would be in his mid-40s, probably about 46, 47. And as I understand it, he would be deported to his country of origin as well. That's correct. That's correct. What you have here is you have a situation of somebody who committed a crime. And I'll admit, it's a heinous crime in certain respects. But there's also, remember, there was a trial court finding that there was, as the judge called it, a certain tenderness in Mr. Nekusheresht's act that he committed, that he didn't want the victim to suffer. And that's why, when you talk about the heinous nature of the offense, you look at the California law, there's, you know, in-rate or not. I hope someone never says to me, I didn't want you to suffer. That's why I strangled and drowned you. I would hope that as well. And I would hope that I'd never be a victim of any of these types of cases, no matter what it is or no matter how less heinous it is. But the bottom line is that when you're looking at these cases, the critical factor in the heinous nature of the offense under California law, In re Ernest Smith talks about it very clearly. Did the individual do anything to prolong the suffering of the victim? Did they torment or terrorize the victim in the course of committing the crime? And under a suicide pact, that's not the case. Well, except there's physical evidence that she was head-butted, she was strangled, there were all sorts of abrasions. He put her in the tub, and then he washed her off after he drowned her, and then he put her back in her clothes. And a post-mortem, there's just things in that, there are things that don't mesh with his explanation of tenderness in a suicide pact. So I don't know, that's what, I don't know what we do with that. Well, I think they do mesh, and the reason is because you look at the serious incisions that he made on himself, and it's talked about in the record that he clearly was intending to kill himself. He was intending for this to go through as a suicide pact. And when counsel talks about the discrepancy in the record, she's talking about the discrepancy between the sun rising and the sun going down. That's not inconsistent, that he has depression, because if you look at, and I believe it's at page 24 of my brief in footnote 10, it lays out the questions and answers. And what Mr. Nekusharest is repeatedly saying is the reason that I got to the point of where I wanted to kill myself was depression. It didn't have anything to do with the victim. But the suicide pact is something separate and apart from that, where he tells her that I'm going to kill myself, and she says, I don't want to live without you, and then the suicide pact develops. The trial court made findings, and the district attorney at the time of the trial said on the record, yeah, there was a suicide pact. And then there was the finding that struck the great violence aggravating factor. But the bottom line is even if you get to a crime that is aggravated, that is serious, that is one that you want to put at the top end, it still is one that under Lawrence is weighed against the programming of the individual when they come to prison. And his is perfect. Lawrence had 115. She had various adverse consequences during the time she was initially in prison, and she improved herself. He's been perfect his entire time that he's been in prison. Counsel, you exceeded your time. Thank you. We kept both counsel past their time. You may have a minute for rebuttal if you want to. Briefly, one thing I'd like to address is the trial court never found that there was a suicide pact. The trial court actually, the judge at sentencing specifically said that this idea that there was a suicide pact appeared to have existed only in the mind of Mr. Nekusaresh. So as far as that goes, there was never a finding that this was a mutual agreement for her to kill her and then kill himself. Again, we need to bring this back to AEDPA, and that the district court is certainly entitled to its opinion that the crime wasn't heinous, that the crime didn't exhibit great violence. But that opinion cannot be used to overturn a state court decision that has been upheld through three levels of state court and that was not based on an unreasonable determination of the facts or a violation of clearly established federal law. And at the end of the day, the only issue is whether the state court decisions violated clearly established federal law. And in this case, there's not. And for that reason, the district court's decision should be overturned. Thank you, counsel. We appreciate the arguments. And the case is submitted.
judges: Graber, Callahan, Bea